**UNITED STATES of America, Plaintiff,**

v.

**Wallace Eugene STEADMAN, Defendant.**

**No. CR–2–78–1.**

United States District Court,
E. D. Tennessee,
Northeastern Division.

March 29, 1978.

John H. Cary, U. S. Atty., and Edward E. Wilson, Asst. U. S. Atty., Knoxville, Tenn., for plaintiff.

Thomas McKinney, Jr., Kingsport, Tenn., for defendant.

## MEMORANDUM OPINION AND ORDER

NEESE, District Judge.

Federal law enforcement officers searched, pursuant to the command of a warrant which was valid on its face, a certain safety deposit box of a bank, in which box the defendant Mr. Steadman has a possessory interest, and in which was found evidence incriminatory of Mr. Steadman under the charge that he possessed insured money which had been taken from the Baileyton, Tennessee branch of the Greene County Bank and carried away, knowing the same to have been taken therefrom, 18 U.S.C. § 2113(c). The defendant moved the Court pretrial to suppress such evidence, Rules 12(b), 41(f), Federal Rules of Criminal Procedure, on the ground that such evidence was procured in violation of the defendant's right to be free of unreasonable search and seizure, Constitution, Fourth Amendment. An evidentiary hearing was conducted on March 22, 1978.

The search warrant involved was issued as the fruit of an affidavit of Mr. Robert Lee Morrison, a special agent of the Federal Bureau of Investigation, who had made oath, *inter alia*, that " * * * FBI [a]gents observed [in the Stipes vehicle, *in-fra* ] on November 11, 1977, a keyring which contained * * * a safety deposit key which was numbered number 845 and bore the name LE Febure, Cedar Rapids, Iowa, and a serial number D25674. * * * " It was stipulated that such key was found in Mr. Morrison's presence by another special agent of the Federal Bureau of Investigation in the closed console of a blue 1970-model Ford Torino automobile. Such automobile at that time was in the constructive custody of the sheriff of Greene County, Tennessee and was the property of Ms. Deborah Stipes. Ms. Stipes had not given her consent for any person to search her vehicle, and no warrant had been issued for its search.

Ms. Stipes and Mr. Steadman resided together in a common-law marriage relationship in Kingsport, Tennessee. Her brother, Mr. Roy L. Stipes, Jr., resided with them. This household maintained three automobiles, including the aforementioned blue 1970 Ford Torino vehicle. These vehicles were used interchangeably by the members of this household, although Mr. Steadman drove but little himself because of faulty vision.

On the morning of November 11, 1977 Ms. Stipes intended to drive the above-described vehicle from her home in Kingsport, Tennessee to Greeneville, Tennessee for a business purpose. She placed therein Mr. Steadman's keyring. When between Blair's Gap and Baileyton on Van Hill road on her journey, she observed that the vehicle's brake-warning light was burning.[1] The vehicle, headed on the roadway in the direction leading toward Baileyton, was parked by Ms. Stipes just off the right-hand side of the blacktop pavement. She sat in the vehicle until an acquaintance, Mr. Jimmy Lane, stopped at the scene in his automobile. She locked the doors and closed the windows of the disabled vehicle and was transported back to her home in Mr. Lane's automobile.

---

1. The front brakes of this automobile had been "plugged", rendering all its braking power in its two rear wheels. It developed afterward that the automobile was in need of brake-fluid.

Mr. Gail Colyer, the aforementioned sheriff, had participated in the (continuing) investigation of an armed robbery of the aforementioned bank branch on October 7, 1977 in which $12,804 in currency had been taken and carried away. He received a report of the presence of a "suspicious" automobile in the vicinity of such institution in Baileyton. He went immediately to Baileyton and joined the search for such "suspicious" automobile. In the process, Mr. Colyer discovered, at about 10:30 o'clock, a. m., the aforementioned Ford Torino automobile parked on the side of well-traveled Van Hill road. He noted that it had out-of-county license plates[2] upon it, and he inquired by radio the identity of its owner.

There were no residential quarters within ½-mile of the parked vehicle, the only structure visible from that point being a barn which was approximately ¼-mile away. In a slight hollow near this barn, investigating officers had discovered the "get-away car" utilized in the aforementioned bank robbery the preceding month. Mr. Colyer caused a search to be made of the nearby barn, and no one was found therein or near it.

Before determining the owner's identity, Mr. Colyer summoned to the scene Mr. Alden Jones and his wrecker from a motor vehicular garage in Baileyton. It was necessary, before towing the automobile, to place it in neutral-gear. At the request of Mr. Colyer, Mr. Jones unlocked a door of the parked vehicle with a wire. Mr. Colyer entered the vehicle and placed it in the appropriate gear. He then searched the interior thereof for some indication of its owner's name and address. He opened the console between the two front seats. Therein, he found a billfold. In the billfold he found a document bearing the name and mailing address of Ms. Stipes as the vehicle's owner. He continued his exploratory search of such billfold and discovered therein also a motor vehicle operator's license issued to Mr. Roy L. Stipes, Jr. The parked vehicle was then towed to Jones' Garage in Baileyton, and Mr. Colyer directed Mr. Jones to retain it in his custody until further notice.

A delivery-trucker notified Mr. James King, a Baileyton police officer, about 9:00 o'clock, a. m., on the same morning that a new 1978 black Chevrolet Monte Carlo automobile was moving in the Baileyton area. Mr. King went to the aforementioned institution, and through its window, observed such a vehicle move along Main street to the vicinity of the bank branch, then to a garage.

At about 9:20 or 9:30 o'clock, a. m., Mr. King saw the defendant Mr. Steadman emerge some ½-block away from the bank branch from that automobile and walk toward the bank branch building. Mr. King entered a police cruiser, overtook Mr. Steadman and directed the latter to enter the police cruiser. Mr. Steadman, at Mr. King's request, provided the latter with a motor vehicle operator's license and a Social Security card. Having satisfied Mr. King of his identity, Mr. Steadman emerged from the police cruiser and commenced walking in the general direction of Van Hill road.[3]

The aforementioned black automobile approached him, and Mr. Steadman waved his arm(s) in the direction of the approaching vehicle. Mr. King suspected another attempt at robbing the bank branch in his community and chased the black automobile unsuccessfully at a high speed.[4] Mr. King observed the driver of the pursued automobile, afterward selected Mr. Stipes, Jr.'s photograph from an array, and identified Mr. Stipes, Jr. personally in the courtroom as its driver.

---

**2.** The vehicle bore license plates, the numerals of which indicated it was from Sullivan County, Tennessee. The nearest point of Sullivan County, Tennessee was approximately 15 miles distant from where the vehicle was discovered.

**3.** Baileyton is a small, rural community, in which Main street traverses a state highway and continues until it intersects with Van Hill road. It is an estimated 1-mile on a direct line from the bank branch to the point where the Stipes automobile was located.

**4.** Hunters discovered this vehicle, which had been stolen, approximately 2 weeks after these events.

In the early afternoon of the same day, Mr. Morrison went to Baileyton to investigate a report of a suspected bank-robbery attempt. Upon his arrival, he received information of the impounding of the Stipes vehicle by Mr. Colyer, noted the place where it had been discovered by him with Mr. Stipes, Jr.'s billfold within it, and was advised also that Mr. Steadman had been seen walking in the direction where such vehicle was discovered. Mr. Morrison and his fellow-agent then went to Jones' Garage where the aforementioned search of the Stipes automobile occurred.

As stated, *supra*, a critical assertion in the affidavit, purportedly supporting the issuance of the warrant for a search of Mr. Steadman's bank safety deposit box, was the information the affiant provided the magistrate concerning the key discovered in the agent's search of the Stipes automobile. This search violated the Constitution, Fourth Amendment. As the late Mr. Justice Frankfurter pointed-out:

> *   *   *   *   *   *

> The Government cannot violate the Fourth Amendment—in the only way in which the Government can do anything, namely through its agents—and use the fruits of such unlawful conduct to secure a conviction. *   *   * Nor can the Government make indirect use of such evidence for its case, *   *   * or support a conviction on evidence obtained through leads from the unlawfully obtained evidence *   *   *. All these methods are outlawed, and convictions obtained by means of them are invalidated, because they encourage the kind of society that is obnoxious to free men [and women]. *   *   *

*Walder v. United States* (1954), 347 U.S. 62, 64–65, 74 S.Ct. 354, 356, 98 L.Ed. 503, 506–507 (headnote 2). The searching FBI agent engaged in an illegal search of the Stipes automobile and found a key; another FBI agent used the fruit of that unlawful conduct to obtain (an otherwise valid) search warrant. The Government would now utilize against the defendant the lead it obtained by unlawful conduct in the effort to obtain his conviction. As Mr. Justice Stewart has admonished more recently:

> *   *   * [W]e must not lose sight of the Fourth Amendment's fundamental guarantee. *   *   * "[I]llegitimate and unconstitutional practices get their first footing *   *   * by silent approaches and slight deviations from legal modes of procedure. This can only be obviated by adhering to the rule that constitutional provisions for the security of person and property should be liberally construed. A close and literal construction deprives them of half their efficacy, and leads to the gradual depreciation of the right, as if it consisted more in sound than in substance. It is the duty of the courts to be watchful for the constitutional rights of the citizen, and against any stealthy encroachments thereon."

> *   *   * Thus the most basic constitutional rule in this area is that "searches conducted outside the judicial process, without prior approval by judge or magistrate, are per se unreasonable under the Fourth Amendment—subject only to a few well-delineated exceptions." The exceptions are "jealously and carefully drawn," and there must be "a showing by those who seek exemption . . . that the exigencies of the situation made that course imperative." "[T]he burden is on those seeking the exemption to show the need for it." In time of unrest, whether caused by crime *   *   *, this basic law and the values that it represents may appear unrealistic or "extravagant" to some. But the values were those of the authors of our fundamental constitutional concepts. In times not altogether unlike our own they won—by legal and constitutional means in England, and by revolution on this continent—a right of personal security against arbitrary intrusions by official power. If times have changed, reducing everyman's scope to do as he pleases in an urban and industrial world, the changes have made the values served by the Fourth Amendment more, not less, important. [Footnote references omitted.]

> *   *   *   *   *   *

*Coolidge v. New Hampshire* (1971), 403 U.S. 443, 454–455, 91 S.Ct. 2022, 2031, 29 L.Ed.2d 564, 575–576[3].

[redacted] The FBI agent who searched the Stipes automobile and found the key, which enabled his fellow-agent of the Government to obtain a search warrant for the defendant's lock-box, had no search warrant; he acted on his own. There was no exigent situation suggesting that he should; his opportunity to search this vehicle was not "* * * fleeting; * * *" the automobile was in the constructive custody, and subject to the orders, of the sheriff of the county in which it was located. There is no suggestion by anyone that, on the date it was subjected to a search, it had been used for any illegal purpose by anyone.

There was no way Ms. Stipes, Mr. Steadman or anyone else could have gained access to it while it was in police custody. As in *Coolidge, supra*: "* * * In short, by no possible stretch of the legal imagination can this be made into a case where 'it is not practicable to secure a warrant.' * * *" *Ibid.*, 403 U.S. at 462, 91 S.Ct. at 2036, 29 L.Ed.2d at 580. No emergency circumstances justified the Government agent in proceeding without a search warrant.

"* * * [T]he basic rule of Fourth Amendment law therefore requires that the fruits of the warrantless seizure [of the lock-box key] be suppressed. * * *" *Ibid.*, 403 U.S. at 478, 91 S.Ct. at 2044, 29 L.Ed.2d at 590[21]. The suppression of the evidence of the lock-box key prevents the use of it to secure the search warrant, in the execution of which the contents of the lock-box, itself, were discovered, and requires a suppression of those contents obtained by the Government agents from the lead provided by "* * * unlawfully obtained evidence. * * *" *Walder v. United States, supra.*

The sole effort by the Government to show the agent is entitled to be exempted from making an unreasonable search and seizure of the Stipes automobile is that Mr. Steadman lacks standing to assert the protection of the Constitution. See *Brown v. United States* (1973), 411 U.S. 223, 93 S.Ct. 1565, 36 L.Ed.2d 208. That case is distinguishable on the comparative facts.

Brown and Smith were charged with transporting and conspiring to transport stolen goods in interstate commerce to their coconspirator whose retail store was searched under a defective warrant while Brown and Smith were in custody in another state. The charges against them were limited to acts committed *before* the day *of* the search, and Brown and Smith did not claim any proprietary interest in the store or its goods.

[redacted] The Supreme Court distinguished Brown's and Smith's situation from a situation in which a defendant was charged with an offense in which the defendant's possession of certain items *at* the time *of* the contested search and seizure was a critical part of the Government's case, *Jones v. United States* (1960), 362 U.S. 257, 263, 80 S.Ct. 725, 732, 4 L.Ed.2d 697, 699. Herein, the allegations in the indictment include the day *on* which the search was conducted, and the charge against Mr. Steadman includes, as an essential element, possession of evidence seized as a result of the contested search and seizure producing the key. Thus, *Brown, supra*, is inapposite factually.

"* * * In order to establish standing to contest a search, a defendant must show that he owned or possessed the seized property *or* [emphasis original] that he had a possessory interest in or was present at the premises searched. * * *" *Cash v. Williams*, C.A. 6th (1972), 455 F.2d 1227, 1229[1]. Here, Mr. Steadman's undisputed ownership of the ring of keys seized in the search of Ms. Stipes' automobile was sufficient to confer standing upon him to challenge the search of such vehicle. *United States v. Truitt*, C.A. 6th (1975), 521 F.2d 1174, 1175[1], citing *Jones v. United States, supra*, and *Cash v. Williams, supra;* see also *United States v. Delguyd*, C.A. 6th (1976), 542 F.2d 346, 350[9].

[redacted] Parenthetically, although unnecessary to a decision herein, this Court is disturbed by the practice being followed in Greene County, Tennessee, whereby its

sheriff and his deputies appear to take-charge-of and search private motor vehicles they find unattended on the sides of the public roads of the county. The federal Constitution, Fourth Amendment, as made applicable to the states by the Constitution, Fourteenth Amendment, applies as much to the *unreasonable* search or seizure of motor vehicles as it does to the search of a home or office. *South Dakota v. Opperman* (1976), 428 U.S. 364, 386, 96 S.Ct. 3092, 3105, 49 L.Ed.2d 1000, 1015 (dissenting opinion) (where a motor vehicle was lawfully impounded for illegal parking violations).

If state law enforcement officers have no more guidance in impounding motor vehicles in Greene County, Tennessee than the use of the individual officer's "own judgment;" if vehicles are "impounded" as a subterfuge for a criminal investigation, *ibid.*, 428 U.S. at 370, 96 S.Ct. at 3097, 49 L.Ed.2d at 1006, n. 5 (majority opinion); and, such officers rummage through documents found therein, *ibid.*, 428 U.S. at 380, 96 S.Ct. at 3102, 49 L.Ed.2d at 1011–1012, n. 7 (concurring opinion), frequent infringements of the federal constitutional rights of owners of temporarily unoccupied and unattended motor vehicles parked in Greene County, Tennessee could be occurring.

In any event, the sustaining of the defendant's motion for a suppression of evidence, obtained by agents of the FBI from his locked safety-deposit box without a warrant free of a "tainted lead", was appropriate. The Court, having been advised by the prosecuting attorney that the prosecution lacks evidence otherwise upon which the defendant could be convicted beyond a reasonable doubt of the charge against him under the indictment herein, the defendant Mr. Wallace Eugene Steadman hereby is RELEASED from custody thereunder.